**RAINBOW LIGHT, Inc., v. CLAUDE NEON LIGHTS, Inc.**

District Court, S. D. New York.  July 25, 1929.

See, also, 31 F.(2d) 988.

Wm. H. Davis and Leslie B. Young, both of New York City, for plaintiff.

Edwin J. Prindle and Wm. Bohleber, both of New York City, for defendant.

FRANK J. COLEMAN, District Judge. The patent in suit covers a process for purifying the glass tubes used in neon lights before the neon is put into them. If a tube is merely evacuated before introducing the neon, impurities will in the operation of the lamp come from the walls of the tube, and, mixing with the neon, cause a great decrease in luminosity. There were various methods of eliminating these impurities from the neon after the contamination, but the patentee sought to prevent the contamination by removing the impurities before the introduction of the neon.

His process consists of introducing into the chamber of the tube a purging agent such as an alkali metal, and causing it to coact with the walls of the tube or with the impurities forced out of them and thereafter evacuating the tube before introducing the neon. According to the specification the coaction between the alkali metal and the walls or the impurities is brought about by having the metal present in the tube in a gaseous state, and by passing an electrical discharge through it, thus ionizing it and causing it to bombard the walls of the tube.

It is plaintiff's theory that the impurities which come from the wall of the tube and pollute the neon during the operation of the lamp are not only gases that were absorbed in the glass, but also gases evolved from a decomposition of some ingredient in the glass under the bombardment of the neon. Plaintiff asserts that the previous bombardment by the vaporized alkali metal not only aids in driving out the absorbed gases before the introduction of the neon, but effects a chemical or physical change in the glass which prevents a subsequent decomposition during operation.

The patent mentions specifically two possible ways of introducing the metal into the chamber of the tube (1) by distilling it from an outside receptacle which is first connected with the tube, but later sealed off when sufficient metal has passed; and (2) by getting the metal from the wall of the tube itself by electrolyzing it out of the glass through the use of heating caps. The specification indicates, however, that there may be other methods of introducing the metal into the chamber

of the tube and that it is the intention to cover them all.

Defendant's process, which is claimed to be an infringement, consists in evacuating sufficient air from the tube to permit an electrical discharge through it, and then causing the discharge to take place until the wall of the tube is heated almost to the melting point, after which the tube is completely evacuated. No alkali metal is put into the chamber of the tube by any separate step such as the distillation or electrolyzation mentioned in the patent. Plaintiff contends, however, that in the heating of the tube to the high temperature which it attains by means of the electrical discharge through it, some sodium is liberated from the glass and vaporized, and that it bombards the wall of the tube as described in the patent.

Many scientific questions were raised at the trial which it is unnecessary to decide in this case—whether the contamination of the neon was caused by liberation of absorbed gases only or also by decomposition of the glass; whether bombarding by the alkali metal had a stabilizing effect on the glass or whether the use of the metal merely assisted in the removal of the impurities from the chamber of the tube after their liberation from the glass; whether defendant's method of heating the tube could cause a liberation of sodium from the glass in such form and in such amounts as would permit of its effectively bombarding the wall as described in the patent, etc. As to most of these questions, I am, frankly, unable to answer them, but I have the comfort of feeling that the experts who testified in reference to them are not in a much better situation. On the question whether an effective bombardment by sodium could be obtained by defendant's process I would, if compelled to decide it, find that the evidence preponderated in the negative; but I have sufficient doubt to make me reluctant to decide it. I will therefore assume answers to all these questions favorable to the plaintiff.

But there is one issue upon which I have no reasonable doubt whatever. I am convinced that the defendant's present process was in use long prior to the patentee's invention in 1925. I was impressed with the truthfulness of defendant's witnesses at the time of the trial, and a reading of their testimony and a study of the briefs has confirmed that impression. Two of them testified that the process was in use in 1923; a third testified it was in use on his employment in 1924; and a fourth stated that it was in use in October, 1925, a few months after the filing of the patent application. The evidence is strong that no change was made in the methods of manufacturing these tubes from 1923 down to date, except that in 1925 a more effective vacuum pumping system was installed. The direct evidence to the contrary seemed to me of practically no weight. Machlett had very little opportunity to observe the process in his casual visits, and Giorke I did not believe.

Aside from the personalities of the witnesses and the individual characteristics of their testimony, strong corroboration of defendant's contention is found in the undisputed facts. In 1923, it was well known in the industry that the more completely the gases absorbed in glass were driven out of it before the introduction of the neon, the more satisfactory would be the lamp; that heating the glass drove out some of the gases, and, the closer to the melting point the temperature was brought, the more complete was the purification; that defendant's only method of heating the tubes, from that time down to the present, was by means of the electrical discharge in them. From these facts it is only natural to infer that defendant, a successful manufacturer of such lamps, brought its tubes during that entire period as close to the melting point of glass as was practical, and did so by means of the electrical discharge. If that treatment now causes sodium to be liberated and to bombard the walls, it did so in 1923. The kind of glass was indisputedly the same, and the laws of physics are unchanged.

Plaintiff contends that previous to the patent application defendant did not heat its tubes as much as now, and bases the contention not only on the direct testimony, which I have mentioned above, but upon certain other considerations. It is urged that it is impossible to heat the glass to a high point without melting the electrodes unless certain conditions of vapor pressure are present in the tube, and that probably defendant did not heed these conditions. I see no force in that argument, because the requisite conditions were well known at the time and were easily attained. Common workmen get the proper conditions of pressure without any scientific knowledge or special instruction.

Furthermore, plaintiff urges that, if defendant had previously to 1925 been using its present process, there would have been no need for three other processes which defendant invented or used, viz.: (1) The scavenging process for removing the impurities from the chamber of the tube after they had been

driven out of the walls; (2) the charcoal process for purifying the neon after its contamination; and (3) the aging process for the same purpose. I find that neither the scavenging nor the charcoal processes were in use in defendant's plant after 1923. A charcoal liquid air pump was used, but not only from the testimony, but from its location with reference to the lamp tube, I am convinced that it was not used during that period for purifying the neon. As to the aging process it is still used to almost the same extent as before 1925, and the diminution in its use is due to the fact that the greater efficiency of the exhaustion pumps installed in that year causes the removal of more of the impurities before the introduction of the neon.

Whether defendant's process utilizes an ionization of sodium in the tube chamber and comes within the claims of plaintiff's patent or not, plaintiff cannot recover, because the process long antedated the patentee's work.

Settle decree on notice.